# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **HILLSDALE ENVIRONMENTAL LOSS PREVENTION, INC., et al.,** | |
| Plaintiffs, | |
| v. | **CONSOLIDATED CASES** |
| | **No. 10-2008-CM-DJW** |
| **UNITED STATES ARMY CORPS OF ENGINEERS, et al.,** | |
| Defendants. | |
| **NATURAL RESOURCES DEFENSE COUNCIL, INC.,** | |
| Plaintiff, | |
| v. | **No. 10-2068-JTM-DWB** |
| **UNITED STATES ARMY CORPS OF ENGINEERS, et al.,** | |
| Defendants. | |

## MEMORANDUM AND ORDER

Plaintiff Natural Resources Defense Council ("NRDC"), and plaintiffs Hillsdale Environmental Loss Prevention, Kansas Natural Resource Council, Chris Axe, Shelly Axe, and Frank Saunders (collectively, "the Hillsdale plaintiffs") bring this consolidated action against defendants United States Army Corps of Engineers ("the Corps"), Lt. Gen. Robert Van Antwerp, and Col. Roger Wilson, Jr., (collectively, "the Corps defendants"); and BNSF Railway Company ("BNSF"). Plaintiffs allege that the Corps violated the National Environmental Policy Act, 42

U.S.C. § 4321 *et seq*. ("NEPA"); the Clean Water Act, 33 U.S.C. § 1251 *et seq.* ("CWA"); the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*. ("APA"); and NEPA implementing regulations, 40 C.F.R. § 1500.1 *et seq*., 30 C.F.R. § 230.1 *et seq*. (2008), by granting a Section 404 Clean Water Act permit to BNSF without completing an Environmental Impact Statement ("EIS").

This matter is currently before the court on Plaintiff Natural Resources Defense Council, Inc.'s Petition for Review of Agency Action and Opening Memorandum in Support Thereof (Doc. 49); and [the Hillsdale] Plaintiffs' Motion for Review of Agency Action and Memorandum in Support (Doc. 50). The court also considers BNSF Railway Company's Memorandum in Opposition to Plaintiffs' Motion and Petition for Review of Agency Action (Doc. 54); the Federal Defendants' Combined Response in Opposition to Plaintiffs' Petitions for Review of Agency Action (Doc. 56); plaintiffs' replies in support of the motion (Docs. 62, 65); BNSF Railway Company's Reply Brief In Opposition to Plaintiffs' Motion and Petition for Review of Agency Action (Doc. 69); the Federal Defendants' Reply Brief in opposition to Plaintiffs' Petitions for Review of Agency Action (Doc. 70), and an Amicus Curiae Brief of the State of Kansas (Doc. 59). The court has reviewed the extensive administrative record with special attention to the parties' compilation of documents cited in the above-mentioned briefs, and has considered the exhibits included in the motions. The briefing on the merits is complete. For the following reasons, the court denies plaintiffs' motions and affirms the decision of the Corps.

### I.    Factual Background

Plaintiffs seek judicial review of the Corps defendants' December 18, 2009 decision to issue a permit under Section 404 of the CWA to BNSF in connection with the construction and development of an intermodal facility (IMF) consisting of a railyard and Logistics Park near

Gardner, Kansas.¹ Plaintiffs challenge not only the permit, but the sufficiency of the Corps' environmental analysis, including the Corps' failure to prepare an EIS. (Doc. 1, at 2.)

The Corps prepared an Environmental Assessment ("EA") for determining whether a full EIS was necessary. Based on its finding of no significant impact ("FONSI"), the Corps did not complete a full EIS.² (Doc. 38, at 4.) Plaintiffs contend that the Corps' issuance of the permit to BNSF—and the resulting construction and operation of the IMF—should have triggered the Corps' obligation to prepare an EIS. They ask this court to find that the Corps violated the CWA and NEPA, to vacate the 404 permit, and to order the Corps to prepare an EIS.

**II.    Standards of Review**

Because none of the statutory or regulatory provisions in question provide for a private cause of action, the judicial review provisions of the APA govern this suit. *See McKeen v. U.S. Forest Serv.*, 615 F.3d 1244, 1253 (10th Cir. 2010). As with other challenges arising under the APA, this court reviews an agency's decision to see whether it is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *New Mex. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009) (quoting 5 U.S.C. § 706(2)(A)).

**A.    NEPA**

To satisfy NEPA's process requirement, the Corps "must prepare one of the following: (1) an environmental impact statement (EIS), (2) an environmental assessment (EA), or (3) a categorical exclusion." *Utah Envt'l Cong. v. Russell*, 518 F.3d 817, 821 (10th Cir. 2008) (quoting *Utah Envtl.*

---

¹ The Environmental Assessment, as well as other documents in the record, refers to the site as the Gardner site because the City of Gardner had planned to annex the site. Subsequently, the site was annexed by the City of Edgerton, Kansas. CE009741, 9742, 9772.

² *See, e.g., Friends of the Bow v. Thompson*, 124 F.3d 1210, 1214 (10th Cir. 1997); 40 C.F.R. § 1501.4.

*Cong. v. Bosworth*, 443 F.3d 732, 736 (10th Cir. 2006)). An agency may prepare an EA if it is uncertain whether a proposed action will significantly affect the environment. An EA is intended to be a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare" a more detailed EIS. 40 C.F.R. § 1508.9. If, pursuant to that EA, the agency determines that a more detailed EIS is not required, it issues a FONSI, which presents the reasons why the proposed agency action will not have a significant impact on the human environment. *See* §§ 1501.4(e), 1508.13; *Utah Envt'l Cong.*, 518 F.3d at 821. For actions falling within a "categorical exclusion," an agency need not prepare either an EA or an EIS. 40 C.F.R. § 1508.4 (categorically excluding actions predetermined not to "individually or cumulatively have a significant effect on the human environment").

In the context of a NEPA challenge, an agency's decision is arbitrary and capricious if the agency (1) entirely failed to consider an important aspect of the problem; (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise; (3) failed to base its decision on consideration of the relevant factors; or (4) made a clear error of judgment. *Nat'l Assoc. of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007); *accord Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1167 (10th Cir. 1999). When reviewing factual determinations made by an agency as part of a NEPA process, short of a "clear error of judgment," the court asks only whether the agency took a "hard look" at information relevant to the decision. *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 710–11 (10th Cir. 2010) (quoting *New Mex. ex rel. Richardson*, 565 F.3d at 704); *see also Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97–98 (1983). "Finally, '[a] presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action.'" *Forest Guardians*, 611 F.3d

at 711 (quoting *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (internal quotation marks omitted)).

The court is mindful that NEPA "simply imposes procedural requirements intended to improve environmental impact information available to agencies and the public. . . . Even if scrupulously followed, the statute 'merely prohibits uninformed—rather than unwise—agency action.'" *New Mex. ex rel. Richardson*, 565 F.3d at 704 (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989)).

**B.     CWA**

The CWA was created to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. 33 U.S.C. § 1251(a). Under Section 404, the Corps may issue a permit for the discharge of dredged or fill material only if the applicant has shown that no practicable alternative exists that is less damaging to the aquatic ecosystem. 40 C.F.R. § 230.10(a) (no permit may issue "if there is a practicable alternative to that proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."). An alternative is practicable "if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purpose." *Id*. at (a)(2). In evaluating practicable alternatives under the CWA, the Corps "has a duty to take into account the objectives of the applicant's project as long as [they are] legitimate." *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1270 (10th Cir. 2004).

While the CWA imposes a more substantive requirement on project planning than NEPA does, the APA's arbitrary and capricious standard also governs decisions under Section 404 of the CWA.

**III.    Questions Presented**

It is plaintiff NRDC's position that the Corps' permitting decision and FONSI was arbitrary and capricious. Plaintiff NRDC argues that (1) the results of the Corps' assessment of fugitive dust emissions warrant preparation of an EIS; (2) the Corps violated NEPA by failing to adequately assess all criteria pollutant and air toxic emissions from the project; and (3) the Corps violated NEPA by failing to quantify project-related greenhouse gas emissions and assess their cumulative impacts. NRDC asks the court to order the Corps to prepare an EIS or in the alternative, a revised EA, and stay the effect of the permit to BNSF until the Corps complies.

The Hillsdale plaintiffs argue that (1) the FONSI was arbitrary and capricious; (2) the Corps' analysis of alternatives was inadequate; (3) the EA was not sufficiently independent; and (4) the permit was improperly issued. They seek a declaratory judgment that defendants are in violation of NEPA and the CWA; an order vacating the Section 404 permit; and an order requiring defendants to prepare an EIS.

**IV.    Discussion**

The court has reviewed the application, the parties' briefing and exhibits, and the voluminous administrative record. The court has focused on those portions of the record jointly submitted by the parties and cited in their briefing. Standing, although addressed by plaintiffs, does not appear to be challenged by defendants. The court therefore summarily agrees that standing exists and proceeds to the merits of the action, combining the arguments proposed by plaintiff NRDC and the Hillsdale plaintiffs.

**A.    Was the Corps Analysis of Alternatives Adequate Under CWA , NEPA?**

Plaintiffs argue that the Corps fails to meet its burden to "clearly demonstrate" that no other practicable, less environmentally damaging alternatives exist. Specifically, plaintiffs assert that

there was no consideration of sites that would not destroy wetlands; there was no consideration of alternatives that would reduce project emissions; and the alternatives considered were improperly narrowed.

As set forth above, no CWA permit may issue "if there is a practicable alternative . . . which would have less adverse impact on the aquatic ecosystem" and which "does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). An alternative is practicable "if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purpose." *Id*. at (a)(2). Where the activity requiring a permit "does not require access or proximity to . . . the special aquatic site . . . to fulfill its basic purpose (*i.e.*, it is not 'water dependent'), practicable alternatives . . . are presumed to be available unless clearly demonstrated otherwise. . . . [And] all practicable alternatives which do not involve a discharge are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise." *Id*. at (a)(3). Finally, no permit should issue "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." *Id*. at (d); *see* 40 C.F.R. § 230.41 (discussing wetlands); § 230.50 (discussing municipal and private water supplies).

Unlike this "least damaging practicable alternative" requirement under the CWA, analysis of reasonable alternatives to proposed agency action under NEPA does not mandate particular results. Therefore, a reviewing court only considers whether the decisions regarding which alternatives to discuss and how extensively to discuss them were arbitrary. The court's goal is to ensure that the agency gathered information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned. 42 U.S.C. § 4332; *Greater Yellowstone Coalition*, 359 F.3d at 1277. Under NEPA, the Corps must give full and meaningful consideration to all reasonable

alternatives. Its obligation to consider alternatives under an EA is a lesser one than under an EIS, which requires "[r]igorous[]" exploration and objective evaluation of all reasonable alternatives. 40 C.F.R. §§ 1502.14(a), 1502.9(b).

In this case, the parties dispute whether all reasonable alternatives were analyzed, and whether there existed a less damaging practicable alternative. Unless the analysis and resulting determinations were arbitrary and capricious, this court must affirm them. And the court does affirm them. The Corps began its analysis based on numerous criteria it received from BNSF. BNSF identifies existing deficiencies at BNSF's Argentine IMF, and reflects projected increased demand for freight transportation and the correlating need for increased capacity at IMFs. The primary purpose of the project is "to provide competitive capacity to accommodate the growing demand for intermodal shipment of freight to and from the Kansas City region and to maintain [the volume of freight carried] on [BNSF's] southern transcontinental mainline." CE009741.

The record reflects that, to address these needs, BNSF considered modifying its existing facilities. Because of lack of adjacent space at its Argentine yard, and the limited capacity and location off the mainline of its Murray yard, BNSF considered developing a new facility. It developed a set of criteria for such a site, which are contained in the EA and which the Corps was under a duty to consider. BNSF specifically sought a site adjacent to the southern transcontinental mainline for technical and operational feasibility; a site with ready access to interstate and/or regional highways; a site with adequate acreage; and a site close enough to Kansas City to take advantage of the existing market—not more than thirty miles from Argentine. CE009751. BNSF evaluated large undeveloped areas using this criteria, and identified five potential sites—Olathe, Gardner, Wellsville South, Le Loup, and Ottawa. CE009753. A private developer identified a sixth site near Atherson. *Id*. The Corps identified a seventh alternative at Wellsville North. CE009753,

-8-

CE021461.  The record establishes that the Corps reasonably concluded BNSF's objectives were legitimate, and that any location that could not meet these baselines would not satisfy the project's purpose and need.  CE009751–53.  Plaintiffs offer no basis for this court to believe that the purpose and need for the project are unreasonable.

The Corps considered these alternatives, including a no-action alternative, but because most of them failed to meet the baseline, the Corps did not require a detailed evaluation of their environmental impacts.  CE009753, CE009763, CE021461.  The Corps did require BNSF to carry forward for further study the Gardner site as well as the Wellsville North site, despite the fact that the Wellsville North site lay "on the fringe of the 30-mile criterion."  CE009753.  Within the Gardner site, four alternative layouts (A through D) were evaluated.  CE009758.  Only one alternative layout (D) for the Wellsville North site was evaluated because it was determined to be the most operationally effective.  CE009762.

The EA presents detailed descriptions of and data relating to each of these alternatives.  In evaluating the environmental effects and consequences of the alternatives, the EA measures direct effects to resources based on construction and opening year operations, it measures indirect effects based on future operations of the IMF twenty years after opening, and it measures indirect traffic effects through five years after opening.  CE009765.  It then compares the relative impacts of each alternative on various resources, including air, wetlands, streams, cultural resources, noise, and geology.  CE009765–812.  Ultimately, the EA concludes that the direct and indirect effects of the proposed action at the Gardner site present the fewest adverse effects and that the Gardner alternative is the least environmentally damaging practicable alternative.  *See*, *e.g.*, CE009768–69, Tables 3.1, 3.2.

Plaintiffs also fault the Corps for adopting BNSF's objectives, which they argue defined the

-9-

project in such an unreasonably narrow manner that only two alternatives, Gardner and Wellsville North, were actually considered; and which only one site—the Gardner site—could accomplish. (Doc. 50, at 35.) However, "an agency need not analyze the environmental consequences of alternatives it has in good faith rejected as . . . remote, speculative, . . . impractical or ineffective." *Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 432 (10th Cir. 1996). And the law requires the agency to give "substantial weight" to the goals and objectives of a private actor seeking action under NEPA. *Citizens Comm. to Save our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1030 (10th Cir. 2002). The evidence contained in the administrative record reveals that the Corps' analysis falls well within the "rule of reason" and satisfies the standards imposed by NEPA. *Greater Yellowstone Coalition*, 359 F.3d at 1277.

As for the CWA, the Corps' finding that the Gardner site is the least environmentally damaging practicable alternative is not an arbitrary or capricious determination based on the record. Here, there was no practicable alternative that did not involve destruction of streams or wetlands. Nor was the Corps required, under the CWA, to look at impracticable sites that would not impact waters of the United States. Of the practicable alternatives, it appears that while the Gardner alternative would affect approximately 4.61 acres of wetlands, the Wellsville North site would affect nearly 16 acres. CE009836; CE001543–44 (stating position by local office of the Department of the Interior's Fish and Wildlife Service that the impacts to waters of the United States would be greater if the IMF were at the Wellsville North site). Moreover, the permit ultimately issued requires BNSF to mitigate the effects to streams and wetlands by constructing a sixty-acre "Conservation Corridor" designed to mitigate 7.18 acres of wetlands for the 4.61 acres impacted. *Id.*; *see also* CE000004, CE000015. The Corps did not act arbitrarily and capriciously; it meaningfully analyzed reasonable alternatives in concluding that the Gardner site was the least damaging practicable alternative.

## B. Was FONSI under NEPA Arbitrary and Capricious?

Under NEPA, an agency must prepare an EIS when facing a proposed action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). Again, an agency need not prepare a full EIS if it initially prepares the less detailed EA and, based on the EA, issues a FONSI concluding that the proposed action will not significantly affect the environment. The EA must discuss appropriate alternatives to the proposed project and must contain the reasons why the proposed agency action will not have a significant impact on the human environment. *See Utah Envtl. Cong. v. Bosworth*, 439 F.3d 1184, 1194–95 (10th Cir. 2006). Again, this court reviews the Corps' actions only to "insure that the agency has taken a 'hard look' at environmental consequences." *Kleppe v. Sierra Club*, 427 U.S. 390, 410, n.21 (1976)).

In assessing whether an agency took the requisite hard look at environmental issues when it prepared its EA under NEPA, this court examines whether (1) the decision relies on factors that Congress intended the agency to consider, (2) the agency failed to consider an important aspect or aspects of the problem, (3) the agency offers an explanation that runs counter to the evidence, or (4) the decision is so implausible that it cannot be the result of differing viewpoints or the result of agency expertise. *Am. Canoe Ass'n v. White*, 277 F. Supp. 2d 1244 (N.D. Ala. 2003) (citing *Sierra Club v. U.S. Corps of Eng'rs*, 295 F.3d 1209, 1214 (11th Cir. 2002).

Plaintiffs direct the court to a number of failures that they allege either individually or collectively establish that the FONSI (and thus the failure to prepare an EIS) was arbitrary and capricious. The court addresses each.

### 1. Plainly Significant Impact to Drinking Water Triggers EIS

The site sits in the watershed of Hillsdale Lake. The "unnamed tributary" running though the site, which is subject to the permit, ultimately joins with Big Bull Creek and drains to or flows

directly into Hillsdale Lake. Plaintiffs argue that, because Hillsdale Lake is a drinking water source, it is "ecologically critical" under the statute and that the threat to the lake of runoff and groundwater contamination are "plainly significant," requiring an EIS. (Doc. 50, at 20) (citing *United States v. 27.09 Acres of Land, More or Less, Situated in Town of Harrison and Town of North Castle, County of Westchester, State of N.Y.*, 760 F. Supp. 345, 353 (S.D.N.Y. 1991), 40 C.F.R. § 1508.27(b)(2) and (b)(3).)

NEPA provides a list of factors an agency may look at to determine significance. 40 C.F.R. § 2508.27(b). Indeed, the approximately 492-acre project will impact a total of 17,302 linear feet of streams, 16.65 acres of open water, and 4.61 acres of wetlands. CE000001. The record, however, establishes that the Corps adequately considered the project's impact on Hillsdale Lake. While the EA acknowledges the possibility of runoff, it notes a limited anticipated use of materials of concern, and it contains remediation and treatment directives that would result in only minor adverse impacts to groundwater and surface water quality. CE009795–96. Moreover, while the lake supplies water to approximately 30,000 residents in Johnson and Miami counties, CE009795, it is not the only source of drinking water, and it has failed to meet Kansas water quality standards for nutrients and is "severely degraded," CE011079, with all of its designated uses impaired. CE025156. The unnamed tributary—9,100 feet of which will be relocated by this project—is of generally low quality and, due to the shutdown of an upstream water treatment facility, is essentially dry. CE000001, 9792, 9794. The Corps therefore found that the project would have minor adverse impact. CE009796.

The Kansas Department of Health and the Environment ("KDHE"), charged with administering certain water quality programs under the CWA, conducted its own independent study and concluded the project would "not result in a violation of Kansas Water Quality Standards." CE009735. Additionally, the record reveals that BNSF planned the project to enhance future water

-12-

quality, and built in a number of mitigation measures designed to avoid or minimize a variety of potential impacts, particularly to water and air quality. *See* CE009836, 9843–44.

The local office of the Department of the Interior's Fish and Wildlife Service, which worked with BNSF on the project and provided comments throughout the process, believes that the mitigation built into the project—the conservation corridor—"will provide improved habitat over current conditions . . . and result in improved water quality downstream." CE001543–44.

In administering and enforcing the CWA, the EPA and the Corps share responsibility; the Corps must regulate discharge of dredged or fill materials by issuing permits and has authority to enforce permit violations, while the EPA holds ultimate responsibility for wetlands protection and, after consultation with the Corps, can block or overrule Corps' decision to issue a permit. *Orange Envt., Inc. v. County of Orange*, 811 F. Supp. 926, 930 (S.D.N.Y. 1993). In this case, the EPA concurred with the Corps decision to issue the permit. CE017063–64 ("With the provision of monitoring and effective implementation of mitigation measures (if needed), EPA concurs with [the Corps'] proposed determination that no significant impact exists. . . . EPA appreciates the efforts undertaken by the Corps to ensure that relevant analyses were challenged—and improved, that the public was informed and engaged, and that mitigation has been secured to address potential impacts.")

The record reveals that the Corps fully disclosed its reasoning and support for the conclusion that the Gardner Site would not have significant impacts on water resources. CE009792–9801. Plaintiffs may disagree, but they fail to show that this decision was arbitrary and capricious.

### 2. Inadequate Assessment of Impact on Air Quality

#### a. Do Fugitive Dust Emissions Alone Trigger Duty to Prepare EIS?

The EA acknowledges a potential for localized significant impacts related to diesel

particulate matter ("PM") from fugitive dust. CE009775–76; *see* CE008297 (noting EA describes air quality impacts as "minor" except for resuspension of fugitive dust.) EPA suggested the project's emissions could potentially exceed federal standards, CE0011373, 17063 n.1, and recommended that monitoring be employed at the site to assess PM impacts and to trigger mitigation measures if necessary. *Id*.; CE022820–21, 23536, 23538, 23662. In response, the Corps required BNSF to enter "a binding mitigation agreement" with KDHE to monitor and mitigate certain PM levels. CE009841.

The Corps maintains that this agreement "ensures potential impacts remain below the level of significance." CE009775. Plaintiffs, however, fault the agreement for containing no actual commitments; lacking evidence that the options are effective in reducing the environmental harms; and for being short-term: it requires monitoring only for the first two years that the IMF is open. Because there is no evidence that the agreement will render the PM emissions so minor as not to warrant an EIS, plaintiffs argue an EIS is necessary.

Mitigation measures can form the basis of a FONSI. *Davis v. Mineta*, 302 F.3d 1104, 1125 (10th Cir. 2002). Such measures must meet some minimal standards, however. First, the measures must be "more than a possibility." *See Wyo. Outdoor Council v. U.S. Army Corps of Eng'rs*, 351 F. Supp. 2d 1232, 1250 (D. Wyo. 2005). They must be imposed by statute or regulation or be integrated into the initial proposal. *Davis*, 302 F.3d at 1125. Agencies should not rely on the possibility of mitigation as an excuse to avoid preparing an EIS. 302 F.3d at 1125. Second, the mitigation measures must "constitute an adequate buffer" that renders such impacts so minor that an EIS is not warranted. *See Greater Yellowstone Coalition*, 359 F.3d at 1276.

The court has reviewed the agreement in the context of the record as a whole and determines that the measures proposed are sufficient to support the Corps' finding. BNSF is required to install

and maintain PM monitoring equipment, which will be operated and monitored by KDHE. If concentrations from these samples approach National Ambient Air Quality Standards (NAAQS) levels, BNSF is required to follow a series of steps, specifically set out in the agreement, to reduce emissions. These steps involve working with KDHE to implement appropriate mitigation measures to ensure acceptable PM levels. Examples of such measures are set out in the agreement, and include increasing vegetation cover, applying dust suppression chemicals, sweeping, and employing road dust reduction strategies. The agreement was developed with oversight by the EPA and "ensures that potential impacts are reduced below the level of significance." CE009841. In light of this agreement, the Corps found that significant fugitive dust impacts are minimized so that only moderate adverse are effects are anticipated. CE009841. The agreement satisfied EPA's air concerns. CE023150. Plaintiffs fail to demonstrate that the Corps made a clear error of judgment or did not consider relevant factors to the project's PM impacts. The court does not believe that the Corps acted arbitrarily in making its FONSI merely because of the inherently conditional and flexible nature of the mitigation measures contained in the agreement.

### b. Does the EA Inadequately Assess Criteria Pollutant and Air Toxic Emissions?

Plaintiffs argue that the EA's assessments regarding air quality were inadequate because the Corps failed to consider such factors as the size of project; diesel PM from trucks on I-35; non-truck emissions; train emissions coming and going; cancer risk from diesel PM; and emissions from construction of the IMF. The court has thoroughly reviewed the record and is not persuaded by plaintiffs' arguments. These arguments are largely based on citation to standards, health risk assessments, studies, and specialized research relating to California's Air Resources Board. These

standards do not apply to this project.[3] Moreover, the record establishes that the Corps thoroughly considered and addressed the relevant air quality concerns in the context of responses to public comments; the final EA also throughly evaluates the project's potential impacts on air quality and addresses numerous steps taken by BNSF to avoid or minimize air impacts. CE009773–77, 9823–25, 9840–46. And the Air Quality Technical Report, which was revised in response to many of these comments, contains discussion of, *inter alia*, applicable air toxic reference concentrations and cancer risk factors, including ozone issues, in evaluating the direct and indirect effects of the proposed action. CE009860–10010.

As for plaintiffs' allegation that the Corps failed to consider the true size and/or nature of the project, the court previously noted, in its November 16, 2010 Order denying plaintiffs' motion to supplement the administrative record, that data relating to projections about the potential size of the warehouse and number of lifts is contained in the administrative record. (Doc. 53, at 5–6) (citing CE009766; CE 009717–18.)

Finally, plaintiffs fault the Corps for failing to quantify greenhouse gas emissions ("GHGs"). However, the Corps made a reasoned conclusion that such quantification was unnecessary. First, EPA has not determined whether GHGs should be regulated. Second, there is no certain method by which to quantify estimates of GHG emissions. CE006608–09. NEPA does not require the Corps to adopt some proposed standards or create its own. The circumstances of this case are distinguishable

---

[3] For instance, plaintiffs fault the Corps for failing to investigate cancer risk associated with diesel PM. However, although California classifies and regulates PM emissions as "known carcinogens," the EPA and applicable federal and state regulations do not treat these emissions as carcinogenic. Nevertheless, the record in this case indicates that the Corps was aware of the issue: concern about cancer risk is documented in nearly 3,000 pages of health risk assessments and various research studies submitted to the Corps. *See* CE001918–4882. Under applicable standards, the Corps was not obligated to address this particular concern in its EA. *See* Amicus Curiae Brief of the State of Kansas (Doc. 59).

-16-

from those in *Center for Biological Diversity v. National Highway Traffic Safety Administration*, 538 F3d 1172, 1216 (9th Cir. 2008), upon which plaintiffs rely.

The Corps did not fail to consider relevant air quality issues, nor were its assessments inadequate for the reasons plaintiffs suggest. The Corps assessment of air quality impacts does not render the FONSI arbitrary and capricious.

### 3. Controversial Nature of the Project

One of the factors used to determine whether a project will "significantly" affect the human environment is "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. §1508.27(4). *See Pub. Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1024 (9th Cir. 2003). Plaintiffs suggest that a "wide variety of government agencies and officials have expressed serious concerns about the project," including (1) the staff of the Johnson County, Kansas government, (2) EPA, (3) KDHE, (4) Mid-America Regional Council ("MARC"), (4) the City of Gardner, and (5) experts on health. (Doc. 50, at 26–30.) A project is controversial if there is substantial dispute as to the size, nature, or effect of the action. 40 C.F.R. § 1508.27(b)(4). Here, plaintiffs show merely opposition, not controversy. There is no substantial dispute as to the size of the project, the nature of the project, or its environmental effect. Indeed, plaintiffs merely argue that the environmental effect requires the Corps to deny the permit, or at least prepare an EIS. The court agrees with the Seventh Circuit's observation that, "when an agency's [FONSI] is based upon adequate data, the fact that the record also contains evidence supporting a different scientific opinion does not render the agency's decision arbitrary and capricious." *See Ind. Forest Alliance, Inc., v. U.S. Forest Serv.*, 325 F.3d 851, 860–61 (7th Cir. 2003).

### 4. Does the Length and Complexity of the EA suggest an EIS is Necessary?

The Corps' EA for the Gardner IMF is 120 pages long. CE009740-9859. As the parties

note, it contains fourteen appendices totaling more than 1,500 pages, and it generated an administrative record of more than 25,000 pages. Plaintiffs argue that, because EAs are generally expected to be brief, the sheer length and complexity of the EA suggests that an EIS is necessary. In support, plaintiff cites, *inter alia*, *Sierra Club v. Marsh*, 769 F.2d 868 (1st Cir. 1985). In that case, the First Circuit in fact held that "[w]e should not give conclusive weight, one way or the other, to the simple facts of EA length, complexity, and controversy. These facts do not by themselves show that the EA's conclusion—'no significant impact'—is correct, nor do they show it is incorrect." 769 F.2d at 875. The court finds plaintiffs' argument unpersuasive. An EA must provide "sufficient evidence and analysis" to determine whether a proposed project will create a significant effect on the environment. 40 C.F.R. § 1508.9. As defendants point out, it is the significance of the impacts, and not the length of the document assessing them, that determines whether an EIS is required.

### 5. Was the EA not Sufficiently Independent?

Plaintiffs argue the Corps did not engage in the requisite independent analysis and instead relied extensively on analysis supplied by BNSF and its consultants. In support, plaintiffs argue that (1) although the Corps told BNSF that, if an EIS was prepared, BNSF could not rely on its consultant, HDR, but would have to retain an independent third-party contractor, BNSF and HDR prepared the draft EA and the technical reports supporting it (Doc. 50, at 44) (citing CE025171, CE022836); (2) the Corps "adopted" BNSF's list of criteria for the proposed site "without question"; and (3) the Corps "protect[ed] BNSF's interests" throughout the comment period process. (Doc. 50, at 45) (citing *Assn. Working for Aurora's Residential Env't v. Colo. DOT*, 153 F.3d 1122, 1128 (10th Cir. 1998) (holding that a contractor with "an agreement, enforceable promise or guarantee of future work" has a conflict of interest under NEPA).)

Plaintiffs' final assertion appears to be speculative at best, and the previous two either are not

supported by the record as a whole or do not lead to the conclusion that the EA was improper or the permit improperly issued. Public Notices were issued August 13, 2007, and included a public meeting and period for written comments. CE 000025–26. Another public notice announcing the availability of the draft EA was issued July 10, 2009. CE000026. Altogether, comments were received from at least four federal agencies, multiple state agencies and local governments, and from numerous private individuals and organizations. CE000026–34. The record contains all the comments, and indicates that the Corps "thoroughly evaluated each comment received." CE000034. The draft EA was modified "to address comments, correct errors, and to clarify issues." CE000034. The Corps did not act arbitrarily or capriciously in relying on findings and certifications of federal, state or local agencies. Nor did the Corps act arbitrarily or capriciously to the extent it relied on the Air Quality and Water Quality Technical Reports, or BNSF's list of criteria regarding the purpose, need, and objectives for the project. Indeed, the reports were the product of extensive involvement and participation by EPA and KDHE, among others, upon whose expertise the Corps was entitled to rely. 40 C.F.R. § 1502.24. Moreover, as discussed above, the law required the Corps to give "substantial weight" to BNSF's goals and objectives. *Citizens Comm. to Save our Canyons*, 297 F.3d at 1030. The evidence contained in the administrative record reveals that the Corps' analysis satisfies the standards imposed by NEPA.

### C. Conclusion

In conclusion, the court finds that the Corps sufficiently examined the environmental impacts of the proposed facility under NEPA requirements. It prepared a detailed analysis in its EA. Moreover, agencies are not required to hold a public hearing before issuing an EA, so courts have held that when they do—as the Corps did here—their "decision is entitled to greater weight." *See River Road Alliance*, *Inc. v. U.S. Army Corps of Eng'rs*, 764 F.2d 445, 451 (7th Cir. 1985). The

FONSI resulting from the EA was not arbitrary or capricious; it was not counter to the great deal of evidence considered by the Corps; and the Corps did not fail to consider an important aspect of the problem. On the contrary, in preparing the EA, issuing the FONSI, and ultimately issuing the 404b permit, this court's review of the administrative record reveals the action was based on consideration of the relevant factors and was an appropriate exercise of the agency's judgment under NEPA and the CWA. *See Utah Envtl. Cong. v. Troyer*, 479 F.3d 1269, 1280 (10th Cir. 2007) (setting out standard under APA). The decision of the Corps is affirmed. Plaintiffs' requests for relief are denied.

**IT IS THEREFORE ORDERED** that Plaintiff Natural Resources Defense Council, Inc.'s Petition for Review of Agency Action and Opening Memorandum in Support Thereof (Doc. 49); and Plaintiffs' Motion for Review of Agency Action and Memorandum in Support (Doc. 50) are denied.

Dated this 28th day of June, 2011 at Kansas City, Kansas.

>  **s/ Carlos Murguia**
>  **CARLOS MURGUIA**
>  **United States District Judge**